**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OLUWASEGUN S. AJISAFE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 25 - 81 (LLA) |
| GOVERNMENT OF THE DISTRICT OF COLUMBIA, *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Oluwasegun S. Ajisafe, proceeding pro se, brings this action against the District

of Columbia alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, the Family Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code

§ 2-1401.01 *et seq.*, in connection with his employment at the District's Department of

Transportation ("DDOT").  ECF No. 1.[1]  Pending before the court are the District's motion to

dismiss, ECF No. 8, and Mr. Ajisafe's motions for an order, ECF No. 12, and for a status

conference, ECF No. 13.  For the reasons explained below, the court will grant in part and deny in

part the District's motion to dismiss and deny Mr. Ajisafe's motions as moot.

---

[1] Mr. Ajisafe initially named both the District and DDOT as Defendants, ECF No. 1, at 1, but he now concedes that DDOT is *non sui juris*—that is, not an entity capable of being sued in its own name, ECF No. 10, at 10.  The court will accordingly dismiss DDOT from this suit.  *See, e.g.*, *Plater v. D.C. Dep't of Transp.*, 530 F. Supp. 2d 101, 102 n.1 (D.D.C. 2008).

## I.    FACTUAL BACKGROUND

The following factual allegations drawn from Mr. Ajisafe's complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion to dismiss, *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Co.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The court further takes judicial notice of documents from the administrative proceedings underlying this action.  *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018) (explaining that "[i]n employment discrimination cases, courts often take judicial notice of [Equal Employment Opportunity Commission ('EEOC')] charges and EEOC decisions" in evaluating a motion to dismiss).

In 2020, Mr. Ajisafe was diagnosed with Attention Deficit Hyperactivity Disorder, Major Depressive Disorder, and severe anxiety.  ECF No. 1, at 11.[2]  In September 2021, he was hired as a Program Analyst for DDOT, a role that involved "managing extensive data collection, analysis, and reporting for Streetcar and Circulator operations."  *Id.* at 12.  Shortly thereafter, Mr. Ajisafe verbally requested an accommodation due to his "permanent . . . clinically diagnosed disabilities." *Id.* at 13 (emphasis omitted).  After being referred to various supervisors, Mr. Ajisafe's request was approved ten months later, in late July 2022, and Mr. Ajisafe was permitted to telework four days a week.  *Id.* at 13-14; *see* ECF No. 1-1, at 61-62.  His accommodation approval form stated that this arrangement did "not create an undue hardship for [DDOT]" and that the accommodation would expire October 31, 2022 unless he contacted DDOT's ADA Coordinator for an extension at least five days in advance.  ECF No. 1-1, at 61.  The accommodation was modified in September 2022 "to enhance its flexibility."  ECF No. 1, at 14; *see* ECF No. 1-1, at 78-80.

---

[2] When citing ECF Nos. 1 and 1-1, the court uses the page numbers generated by CM/ECF at the top of each page rather than any internal pagination.

On October 12, 2022, Mr. Ajisafe emailed DDOT ADA Coordinator Nana Bailey-Thomas, requesting an extension of his accommodation.  ECF No. 1, at 14; *see* ECF No. 1-1, at 136.  He noted that the four-day teleworking arrangement had improved his productivity and provided him with the flexibility to attend medical appointments and care for his health.  ECF No. 1-1, at 136.  Mr. Ajisafe also highlighted his positive performance evaluation for the previous fiscal year, in which his evaluators had "commended [his] ability to meet deadlines and maintain productivity under the [accommodation]."  ECF No. 1, at 14.  In response to his request, DDOT Equity and Accessibility Program Analyst Zachary Smith "issued a redundant and burdensome demand for additional medical documentation to re-justify" the accommodation.  *Id.* at 15.  Mr. Ajisafe opposed the demand, responding that his healthcare provider "consider[ed] [the] request inconsistent with ADA-established Law" because he had already submitted documentation establishing his disability, and he requested a meeting to address the documentation requests.  ECF No. 1-1, at 138.  When Mr. Ajisafe met with Ms. Bailey-Thomas and Mr. Smith on October 31, they "questioned the necessity of maintaining [his] four-day telework arrangement" and suggested reducing the number of days he could telework.  ECF No. 1, at 16-17; *see* ECF No. 1-1, at 139 (Mr. Ajisafe's email summarizing the meeting).

In mid-December 2022, Mr. Smith sent Mr. Ajisafe another email requesting additional medical information for his extension request and "threat[ening] to terminate [his accommodation] if the requested documentation was not received by January 6, 2023."  ECF No. 1, at 18; *see* ECF No. 1-1, at 88.  The email stated that Mr. Ajisafe's doctor should specify the need for him to telework four days a week as opposed to DDOT's "routine telework schedule" of two days per week and "indicate how long the accommodation is needed and whether treatment will lessen the need for accommodation."  ECF No. 1-1, at 88.  This deadline caused Mr. Ajisafe "severe anxiety

and emotional strain" and made it difficult for him to secure documentation during the holiday season. ECF No. 1, at 18. On January 3, 2023, Mr. Ajisafe submitted the requested form, in which his healthcare provider recommended that he "continue to work from home for four days per week" and stated that he would need this accommodation for "years." ECF No. 1-1, at 93-94. On January 5, Mr. Ajisafe was notified that his accommodation would not be extended because the documentation he had provided did not "adequately identify" the need for him to telework four days a week. *Id.* at 64. The termination of his accommodation caused Mr. Ajisafe to suffer from sleeplessness for five days and "deprived [him] of the flexibility necessary to manage [his] disabilities." ECF No. 1, at 20.

Mr. Ajisafe subsequently requested that DDOT reconsider his accommodation request. *See* ECF No. 1-1, at 146. Ms. Bailey-Thomas denied the request, stating that she was "unable to overturn [Mr. Smith's] determination." *Id.* at 147. On April 3, 2023, Mr. Ajisafe "escalated [his] concerns to DDOT leadership," explaining the harm caused by the termination of his accommodation and informing them of his intent to file a formal complaint. ECF No. 1, at 23, 26; *see* ECF No. 1-1, at 148. DDOT Deputy Director Sharron Kershbaum responded that DDOT's decision was final. ECF No. 1, at 23, 26-27. Mr. Ajisafe was thereafter subjected to "[i]nvasive monitoring via newly introduced hourly activity logs," "unrealistic workloads and deadlines," and a "noticeable shift from collaboration to overt hostility." *Id.* at 23 (emphases omitted). Specifically, on April 6, he was assigned a "special project" outside the scope of his responsibilities. ECF No. 1-1, at 149. This increase in workload forced him to work unpaid overtime, including overnight, and exacerbated his disabilities. ECF No. 1, at 24-25; *see* ECF No. 1-1, at 156-58. Beginning April 11, Mr. Ajisafe was also required to submit weekly reports documenting his hours and work activities. *See* ECF No. 1-1, at 150.

On May 4, 2023, Mr. Ajisafe asked Ms. Bailey-Thomas to identify the parts of his submitted documentation that were "unclear or that disqualif[ied] [him] from continuing with the previously approved ADA accommodation." ECF No. 1, at 20-21. Ms. Bailey-Thomas did not respond to his email. *Id.* at 21. Ms. Bailey-Thomas also "falsely accused [Mr. Ajisafe] of fabricating a panic attack" and "falsely informed [his] healthcare provider that [he] was already being adequately accommodated," which undermined his credibility and "disrupted the sacred Patient-Doctor trust necessary for managing [his] healthcare." *Id.* at 28. Also in May, Mr. Ajisafe was placed on a Performance Improvement Plan ("PIP") based on "performance deficiencies that directly resulted from [the District's] refusal to provide reasonable accommodations and the retaliatory workload increase." *Id.* at 25; *see* ECF No. 1-1, at 67-69.

In June 2023, Mr. Ajisafe attempted suicide and was hospitalized for around eight weeks. ECF No. 1, at 29; *see* ECF No. 1-1, at 159-61. His doctor informed DDOT that Mr. Ajisafe needed time to recover and provided additional documentation and emails "emphasizing the critical nature of uninterrupted recovery." ECF No. 1, at 31. Despite his doctor's correspondence, DDOT continued sending Mr. Ajisafe PIP updates and reminders of upcoming deadlines, which "triggered renewed emotional distress, leading to a second hospitalization." *Id.* On July 13, Mr. Ajisafe's healthcare provider submitted an FMLA application to allow Mr. Ajisafe to "fully participate in a Partial Hospitalization Program and subsequent Intensive Outpatient Program for continued treatment." *Id.* at 32; *see* ECF No. 1-1, at 162-63, 171. The FMLA application stated that Mr. Ajisafe had been "incapacitated" from June 29 to July 20. ECF No. 1-1, at 163. On July 26, DDOT requested additional documentation from Mr. Ajisafe with a deadline of August 15. ECF No. 1, at 32; *see* ECF No. 1-1, at 171. Mr. Ajisafe's healthcare provider promptly submitted the documents, but the District "demanded [Mr. Ajisafe] return to work on

August 1, 2023, despite the ongoing FMLA process."  ECF No. 1, at 32.  When Mr. Ajisafe did not return to work on August 2, he was charged with Absence Without Leave ("AWOL") status for July 26, July 27, July 31, August 1, and August 2.  *Id.*; *see* ECF No. 1-1, at 164.

In September 2023, Mr. Ajisafe requested another accommodation.  ECF No. 1-1, at 71-78.  On September 18, DDOT approved his request for full-time telework for a one-month trial period to end on October 20.  *Id.* at 78-79.  Two days later, Mr. Ajisafe submitted a notice of resignation.  *See id.* at 82.  He was "forced to resign" from his position on October 4.  ECF No. 1, at 36.

## II.    PROCEDURAL HISTORY

On December 4, 2023, Mr. Ajisafe filed a charge of discrimination with the EEOC and the D.C. Office of Human Rights, alleging that DDOT had discriminated and retaliated against him based on his disability in violation of the ADA.  ECF No. 1-1, at 57-58.  On December 14, the EEOC issued a notice that Mr. Ajisafe's charge would be "dual-filed with D.C. Office of Human Rights" and that the EEOC's Washington office would investigate the charge for both agencies under their work-sharing agreement.  *Id.* at 55.[3]  DDOT argued in its position statement that Mr. Ajisafe had failed to state a claim of discrimination or retaliation under the ADA.  *See id.* at 95-102.  On October 7, 2024, the EEOC determined that it would not proceed further with its investigation into Mr. Ajisafe's charge and notified him of his right to sue within ninety days.  *Id.* at 47-51.

---

[3] On December 5, 2023, the EEOC informed Mr. Ajisafe that it would not investigate his claim and notified him of his right to bring suit within ninety days, ECF No. 1-1, at 83-87, but it later withdrew that determination and the right-to-sue letter, *id.* at 52.

On January 6, 2025, Mr. Ajisafe, proceeding pro se, filed suit in this court.  ECF No. 1. His complaint raises six claims: (1) failure to accommodate his disability under the ADA, the Rehabilitation Act, and the DCHRA; (2) disability discrimination under the ADA and the DCHRA; (3) retaliation under the ADA and the DCHRA; (4) hostile work environment under the ADA and the DCHRA; (5) constructive discharge under the ADA and the DCHRA; and (6) interference under the FMLA.  ECF No. 1, at 42-50.  The District moved to dismiss, ECF No. 8, and that motion is fully briefed, ECF Nos. 8, 10, 11.  In September 2025, Mr. Ajisafe moved for a status update or ruling on the District's motion to dismiss, ECF No. 12, and in February 2026, he moved for a status conference, ECF No. 13.

### III.    LEGAL STANDARDS

#### A.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Nor will "'naked assertion[s]' devoid of 'further factual

enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)). As noted, the court may take judicial notice of Mr. Ajisafe's EEOC materials without converting a motion to dismiss into one for summary judgment. *Golden*, 319 F. Supp. 3d at 366 n.2.

### B.    Pro Se Litigants

Pleadings by pro se litigants are generally held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). This liberal construction "is not, however, a license to ignore the Federal Rules of Civil Procedure." *Sturdza v. United Arab Emirates*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009). The court will consider all of Mr. Ajisafe's filings and attachments, not just his complaint, in evaluating the District's motion to dismiss. *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 151-52 (D.C. Cir. 2015).

### IV.    DISCUSSION

Mr. Ajisafe alleges that the District of Columbia violated the ADA, the Rehabilitation Act, and the DCHRA by failing to accommodate his disability (Count 1); violated the ADA and the DCHRA by discriminating against him on the basis of his disability (Count 2), retaliating against him for engaging in protected activity (Counts 3A and 3B), creating a hostile work environment (Count 4), and constructively discharging him (Count 5); and violated the FMLA by charging him

with AWOL while his FMLA application was pending (Count 6).  ECF No. 1, at 42-50.  The District argues that Mr. Ajisafe's complaint should be dismissed for failure to state a claim.  ECF No. 8.  The court will grant the District's motion to dismiss Mr. Ajisafe's hostile work environment and constructive discharge claims in their entirety and his discrimination, retaliation, and FMLA interference claims in part, but it will deny the motion as it concerns Mr. Ajisafe's failure-to-accommodate claim and parts of his discrimination, retaliation, and FMLA claims.

### A.    Failure to Accommodate (Count 1)

Mr. Ajisafe's failure-to-accommodate claims under the ADA, the Rehabilitation Act, and the DCHRA "are governed by the same standards, with the ADA as the common thread."  *Thomas v. District of Columbia*, No. 22-CV-1269, 2023 WL 2610512, at *5 (D.D.C. Mar. 23, 2023).  The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability . . . [in the] terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  *Id.* § 12112(b)(5)(A).  Reasonable accommodations may include "making existing facilities used by employees readily accessible," "modified work schedules," or adjusting "training materials or policies."  *Id.* § 12111(9).  To state a claim for failure to accommodate, a plaintiff must show "(1) that he or she has a disability under the ADA; (2) that the employer had notice of the disability; (3) that the plaintiff could perform the essential functions of the position either with reasonable accommodation or without it; and (4) that the employer refused to make the accommodation."  *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018).

Mr. Ajisafe alleges that the District failed to accommodate his disability when, in January 2023, it declined to extend the accommodation allowing him to telework four days per

9

week, "[d]espite the proven effectiveness of this accommodation [and] without evidence of undue hardship or inefficacy." ECF No. 1, at 42. The District does not dispute that Mr. Ajisafe has a disability, that it had notice of his disability, and that he could perform the functions of his job with reasonable accommodations. *See* ECF No. 11, at 3. The court will therefore focus on whether the District denied his request for a reasonable accommodation.

Mr. Ajisafe has plausibly alleged that the District denied his request to extend his telework schedule as a reasonable accommodation. Specifically, he alleges that "[o]n January 5, 2023, the defendant abruptly terminated my Reasonable Accommodation (RA) without justification." ECF No. 1, at 19. That is all that is needed to survive a motion to dismiss. *See, e.g.*, *Lanier v. Smedberg*, No. 23-CV-2922, 2025 WL 2144075, at *7 (D.D.C. July 29, 2025) (denying a motion to dismiss where the plaintiff alleged "that he was disabled, that the defendants had notice of his disability, and that he requested a reasonable accommodation, including a reduced work schedule, but did not receive that accommodation and instead was abruptly terminated").

To be sure, the District argues that it was justified in declining to extend Mr. Ajisafe's reasonable accommodation because Mr. Ajisafe did not provide the updated medical documentation "necessary for [the District] to assess whether the accommodation should remain in place or be modified." ECF No. 8, at 10. Once an employee requests an accommodation, an employer must "engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Jones v. District of Columbia*, No. 23-CV-1488, 2024 WL 1213326, at *10 (D.D.C. Mar. 21, 2024) (quoting *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000)); *see* 29 C.F.R. § 1630.2(o)(3). In the interactive process, "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *Equal Emp. Opportunity*

10

*Comm'n v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). Accordingly, "when the parties are missing information that can only be provided by one of the parties, the party withholding the information may be found to have obstructed the process." *Id.* (quoting *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005)). An employee who "materially obstructs the informational exchange—for example, by withholding relevant medical information—cannot prevail on a failure-to-accommodate claim." *Ali v. Regan*, 111 F.4th 1264, 1275 (D.C. Cir. 2024).

Seeking to take advantage of these cases, the District maintains that Mr. Ajisafe is the party responsible for "obstructing the interactive process" by failing to provide the requested documentation. ECF No. 8, at 10. The trouble for the District is that Mr. Ajisafe alleges in his complaint that he timely submitted the required documentation, which "explicitly reaffirmed the necessity and proven effectiveness of the [accommodation] in managing [his] disabilities." ECF No. 1, at 19. He further alleges that, after the District terminated his accommodation, he contacted the ADA Coordinator seeking to address any deficiencies in the documentation. *Id.* at 20-21. The court therefore cannot conclude, as a matter of law at the motion-to-dismiss stage, that Mr. Ajisafe "fail[ed] to engage in the interactive process," ECF No. 8, at 10, in a way that prevented the District from offering a reasonable accommodation, *see Pressley v. Mgmt. Support Tech., Inc.*, No. 22-CV-2262, 2023 WL 5206107, at *11 (D.D.C. Aug. 14, 2023) (denying a motion to dismiss where the plaintiff alleged that "he made it clear to [his employer] that he was seeking accommodations for his disabilities" but his employer "caused a breakdown of the interactive process"); *Teasdell v. District of Columbia*, No. 15-CV-445, 2016 WL 10679536, at *11 (D.D.C. Sep. 16, 2016) (rejecting an employer's argument that the plaintiff did not engage in the interactive process where the complaint contained allegations that the employer "was in possession

11

of at least some information about the nature of his disability" and the plaintiff's "disability was obvious").

In its reply brief, the District relatedly contends that it provided Mr. Ajisafe an accommodation permitting him to telework two days per week and that Mr. Ajisafe failed to explain why that "alternative accommodation" was insufficient.  ECF No. 11, at 4-5.  This argument fails because teleworking two days a week was Mr. Ajisafe's "normal" schedule under DDOT's telework policy, not an "alternative accommodation" offered to Mr. Ajisafe.  *Id.*; *see* ECF No. 1, at 12, 35.  In any event, the District's argument goes to the reasonableness of Mr. Ajisafe's requested accommodation, which is "typically an inappropriate inquiry at the motion to dismiss stage."  *Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 96 (D.D.C. 2021).  Accordingly, the court will deny the District's motion to dismiss Count 1.

### B.    Disability Discrimination (Count 2)

"To demonstrate discrimination in violation of the ADA or the DCHRA, the plaintiff 'must prove that he had a disability within the meaning of the ADA, that he was "qualified" for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability.'"  *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (quoting *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc)).  The parties do not dispute the first two prongs, *see* ECF No. 8, at 11; ECF No. 10, at 13, so the court will focus on whether Mr. Ajisafe suffered an adverse action as a result of his disability.

The Supreme Court recently clarified the standard for an actionable adverse employment action in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).  There, the Court explained that a plaintiff must simply allege "some harm" regarding the terms or conditions of his employment to

support a discrimination claim.  *Id.* at 350.  That holding is largely consistent with the D.C. Circuit's decision in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc), in which the Circuit held that a plaintiff need only allege some change with respect to the terms and conditions of his employment (as opposed to an "objectively tangible harm") to plead an adverse action.  35 F.4th at 874-75.  While *Muldrow* and *Chambers* concerned Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, *see* 601 U.S. at 350; 35 F.4th at 872, courts have applied *Muldrow* to ADA claims because "the relevant statutory language is 'virtually identical,'" *Alao v. District of Columbia*, No. 24-CV-784, 2025 WL 885202, at *6 (D.D.C. Mar. 21, 2025) (quoting *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112 n.4 (1st Cir. 2024)); *see Tuck v. District of Columbia*, No. 24-CV-2609, 2025 WL 2159182, at *2 (D.D.C. July 30, 2025) (applying the *Muldrow* standard to an ADA discrimination claim).

To show that the adverse action was "because of his disability," *Giles*, 794 F.3d at 5, Mr. Ajisafe must allege a causal connection between the adverse action and his disabled status, *see Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  One way that a plaintiff can satisfy this burden is "by showing 'that [he] was treated differently from similarly situated employees who are not part of the protected class.'"  *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)).  While "there is a very low bar for alleging an inference of discrimination" at the motion-to-dismiss stage, *Sims v. Sunovion Pharms., Inc.*, No. 17-CV-2519, 2019 WL 690343, at *8 (D.D.C. Feb. 19, 2019), a plaintiff bears the burden of alleging "some facts" to give rise to the reasonable inference that his disability "was the reason for [the] defendant's actions," *Keith v. U.S. Gov't Accountability Off.*, No. 21-CV-2010, 2022 WL 3715776, at *3 (D.D.C. Aug. 29, 2022) (quoting *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 102 (D.D.C. 2021)).

13

Mr. Ajisafe alleges that the District discriminated against him by (1) revoking his reasonable accommodation, (2) increasing his workload, and (3) engaging in hostile interactions. ECF No. 1, at 43. The District argues that Mr. Ajisafe has failed to allege either adverse action or causation for each. ECF No. 8, at 11. As explained below, the court concludes that Mr. Ajisafe has failed to plausibly allege that the District discriminated against him by revoking his accommodation and engaging in hostile interactions, but it will allow him to proceed on his disability discrimination based on his increased workload.

### 1.    Termination of the telework reasonable accommodation

The District first argues that the termination of Mr. Ajisafe's reasonable accommodation cannot support a discrimination claim separate from his failure-to-accommodate claim. ECF No. 8, at 12.[4] The court agrees. Mr. Ajisafe's theory that he suffered an adverse employment action when the District revoked his reasonable accommodation in January 2023 is duplicative of his failure-to-accommodate claim. Both "stem from the same factual allegations"—namely the termination of his four-day-per-week telework arrangement. *Sandler v. Blinken*, No. 21-CV-2226, 2022 WL 4547557, at *7 (D.D.C. Sep. 29, 2022); *see Foster v. Driscoll*, No. 23-CV-1409, 2025 WL 1100028, at *4 (D.D.C. Apr. 14, 2025) (dismissing disparate treatment claims under the Rehabilitation Act as duplicative of retaliation claims where the claims "stem[med] largely, if not exclusively, from the same frustrations with the accommodation process").

---

[4] As the District points out in its reply brief, Mr. Ajisafe fails to address these and other deficiencies in his opposition brief. "[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded." *Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010). While the court could deem Mr. Ajisafe to have conceded the District's arguments, it will nevertheless address the merits of his claims in light of his pro se status. *See Nabaya v. Dudeck*, 38 F. Supp. 3d 86, 96 (D.D.C. 2014).

Mr. Ajisafe also does not plausibly allege that he was treated differently than non-disabled employees who "retained telework privileges," ECF No. 1, at 43, which could potentially support a disability discrimination claim independent of his failure-to-accommodate claim, *see, e.g.*, *Sims*, 2019 WL 690343, at \*8 (finding that a plaintiff stated an ADA discrimination claim where she "pointed to allegedly similarly[] situated employees . . . who were treated more favorably"). Even after the revocation of his accommodation, Mr. Ajisafe was permitted to telework two days per week—the same as non-disabled employees under DDOT's policy. *See* ECF No. 1, at 12; ECF No. 1-1, at 64. Perhaps seeking to use himself as his own comparator, Mr. Ajisafe contends that the District must have discriminated against him based on his "invisible" mental disabilities because the District reinstated his accommodation in September 2023 after his disabilities "became physically manifest." ECF No. 10, at 14 (arguing "disparate treatment of mental disability"). But Mr. Ajisafe's disability was also "invisible" when he first received his accommodation in July 2022, so he cannot claim that the District discriminated against him by revoking his accommodation, when his disability was still "invisible." Accordingly, the court will dismiss this claim.

### 2.    Increased workload

Mr. Ajisafe next alleges that the District imposed "[d]isparate workload expectations that failed to account for [his] disabilities." ECF No. 1, at 43. When an employee's increased workload "negatively impact[s] [his] work environment," the employee suffers "some harm" to an employment term or condition. *Mitchell v. Garland*, No. 23-CV-2412, 2024 WL 3251217, at \*4 (D.D.C. July 1, 2024) (quoting *Muldrow*, 601 U.S. at 355). Here, Mr. Ajisafe alleges that he was assigned work that was not part of his agreed-upon job responsibilities, forcing him to "work unpaid overtime," including overnight, and causing "chronic sleep deprivation and heightened

anxiety." ECF No. 1, at 24-25; *see* ECF No. 1-1, at 156-158. These allegations are sufficient to show "some harm" to the terms and conditions of Mr. Ajisafe's employment. *See Rhone v. Rubio*, No. 24-CV-3389, 2025 WL 3017791, at *7 (D.D.C. Oct. 28, 2025) (finding that an increase in the plaintiff's work assignments causing her to work weekends without pay was an adverse employment action). And because the District does not argue that Mr. Ajisafe has failed to allege a causal connection between this adverse action and his disability, this claim may proceed.

### 3.    Hostile interactions

Finally, Mr. Ajisafe alleges that the District engaged in "[h]ostile interactions questioning the legitimacy of [his] disability." ECF No. 1, at 43. The District argues that these interactions do not rise to the level of actionable adverse action because Mr. Ajisafe fails to show that they "altered the terms, conditions, or privileges of his employment." ECF No. 8, at 12. While Mr. Ajisafe's opposition does not identify the interactions that form the basis for this claim, his complaint refers to a few "hostile" encounters in which his colleagues questioned his disability. First, Mr. Ajisafe alleges that during his October 31, 2022 meeting with Ms. Bailey-Thomas and Mr. Smith, Ms. Bailey-Thomas "questioned the necessity of maintaining [his] four-day telework arrangement." ECF No. 1, at 17. But such questioning is, "at most, akin to the 'rude and disrespectful' behavior that courts have 'consistently held' fail to give rise to a discrimination claim." *Keith v. U.S. Gov't Accountability Off.*, No. 21-CV-2010, 2023 WL 6276635, at *6 (D.D.C. Sep. 26, 2023) (quoting *Taylor v. Haaland*, No. 20-CV-3173, 2022 WL 990682, at *3 (D.D.C. Mar. 31, 2022)) (concluding that negative comments relating to the plaintiff's disability did not amount to an adverse employment action).

Mr. Ajisafe also alleges that, in May 2023, Ms. Bailey-Thomas "falsely accused [him] of fabricating a panic attack" in "official correspondence" and "falsely informed [his] healthcare

provider that [he] was already being adequately accommodated." ECF No. 1, at 28. To the extent these allegations describe "[h]ostile interactions questioning the legitimacy of [Mr. Ajisafe's] disability," ECF No. 1, at 43, they do not rise to the level of adverse employment actions. Mr. Ajisafe alleges various harms stemming from Ms. Bailey-Thomas's false assertions, including severe emotional distress and erosion of trust with his healthcare provider. *See id.* at 29. But Mr. Ajisafe's complaint does not allege any facts explaining how Ms. Bailey-Thomas's alleged actions affected the terms, conditions, or privileges of his employment. *See Rhone*, 2025 WL 3017791, at *8 (concluding that "unpleasant workplace interactions," such as being "chastise[d]" and "berate[d]" by supervisors, were not adverse employment actions (alterations in original) (internal quotation marks omitted)). Mr. Ajisafe's allegations concerning "hostile interactions" are therefore insufficient to survive a motion to dismiss his disability discrimination claim.

### C.    Retaliation (Counts 3A and 3B)

To state a claim for retaliation under the ADA or the DCHRA, "a plaintiff must plausibly allege that (1) [he] engaged in statutorily protected activity, (2) [he] suffered a materially adverse action by [his] employer, and (3) the two are causally connected." *Robinson v. District of Columbia*, No. 23-CV-3823, 2024 WL 4722157, at *6 (D.D.C. Nov. 8, 2024) (alterations in original) (quoting *Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 539 (D.C. Cir. 2024)). Mr. Ajisafe bases his retaliation claims on the revocation of his accommodation, his increased workload, "[i]nvasive [m]onitoring," and placement on a PIP. ECF No. 1, at 44-47. The District argues that Mr. Ajisafe failed to administratively exhaust some of these claims, that he did not engage in protected activity, and that the revocation of his accommodation and his increased workload are not materially adverse actions. ECF No. 8, at 13-15. The court concludes that Mr. Ajisafe has sufficiently alleged that the District retaliated against him by increasing his

17

workload, "[i]nvasive[ly] [m]onitoring" him, and placing him on a PIP but that his claims concerning the revocation of his accommodation must be dismissed.

### 1.   Exhaustion

As a threshold matter, the District contends that some of Mr. Ajisafe's ADA retaliation claims are time-barred.  To state a retaliation claim under the ADA, "the adverse action must have occurred within the 300-day window preceding the filing of an EEOC charge."[5] *Robinson*, 2024 WL 4722157, at *6.  The District argues that the denial of Mr. Ajisafe's request to extend his accommodation and subsequent increased workload and monitoring are untimely because they fall outside the 300-day window preceding the filing of his EEOC charge.  ECF No. 8, at 13-14.  The court agrees that Mr. Ajisafe's claim based on the District's failure to extend his accommodation is time-barred.  However, Mr. Ajisafe's other alleged adverse actions are timely.

Mr. Ajisafe filed his EEOC charge on December 4, 2023, *see* ECF No. 1-1, at 57-58, so only those retaliatory acts that occurred after February 7, 2023 are timely.  The District denied Mr. Ajisafe's request to extend his accommodation on January 5, 2023, *see id.* at 64, which falls outside the 300-day window preceding his EEOC charge.[6]  Mr. Ajisafe's other alleged retaliatory

---

[5] An aggrieved party typically has 180 days to file a charge with the EEOC.  42 U.S.C. § 2000e-5(e)(1).  But "when the EEOC has a work-sharing agreement with its state counterpart, as it does with the District of Columbia, this deadline is extended to 300 days."  *Congress v. District of Columbia*, 324 F. Supp. 3d 164, 169 n.1 (D.D.C. 2018).  When a charge of discrimination is filed with the EEOC in the District of Columbia, a claim is automatically cross-filed with the D.C. Office of Human Rights pursuant to their work-sharing agreement. *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 78 (D.D.C. 2009).

[6] A party generally may not amend his complaint through an opposition brief.  *See Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014).  But in light of Mr. Ajisafe's pro se status, the court will consider arguments raised for the first time in his opposition.  *See Brown*, 789 F.3d at 151-52 (holding that the district court abused its discretion by failing to consider allegations

(*continued on next page*)

acts, however, are timely. Specifically, Mr. Ajisafe alleges that the District increased his workload and required him to submit hourly activity logs beginning in April 2023, *see id.* at 149-50, and placed him on a PIP in May 2023, *see id.* at 67-69, all of which fall within the 300-day window.

### 2.    Protected activity

The District argues that Mr. Ajisafe fails to allege that he engaged in protected activity because he does not allege that he "complained to agency leadership about discrimination." ECF No. 8, at 14-15. The court disagrees. Protected activity "encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct." *Peters v. District of Columbia,* 873 F. Supp. 2d 158, 200 (D.D.C. 2012). But "[n]ot every complaint garners its author protection." *Id.* at 205 (alteration in original) (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick*, 437 F.3d at 1232. The court concludes that Mr. Ajisafe has cleared this hurdle for the purpose of withstanding the District's motion to dismiss.

To begin, Mr. Ajisafe's opposition to the District's "demand for redundant medical documentation" constitutes protected activity. ECF No. 1, at 44. In his email, Mr. Ajisafe stated that his doctor considered the request "inconsistent with ADA-established [l]aw" because Mr. Ajisafe had already submitted records that "substantiated that [he] ha[d] a disability covered under [the] ADA." ECF No. 1-1, at 138. The email does not merely express "frustrated ambition," *Broderick*, 437 F.3d at 1232, or "simply object to 'mistreatment in general, without connecting it

---

raised by a pro se litigant in opposition to a motion to dismiss). Mr. Ajisafe argues in his opposition that all of his claims are timely because he filed a timely complaint with the D.C. Office of Human Rights, *see* ECF No. 10, at 17, but that complaint does not affect the timeliness of his federal ADA claims.

to membership in a protected class,'" *Ingram v. District of Columbia*, No. 18-CV-1598, 2021 WL 3268379, at *10 (D.D.C. July 30, 2021) (quoting *Vogel v. D.C. Off. of Planning*, 944 A.2d 456, 464 (D.C. 2008)), *aff'd sub nom.*, *Ingram v. D.C. Child & Fam. Servs. Agency*, No. 21-7085, 2022 WL 1769140 (D.C. Cir. June 1, 2022).   Rather, Mr. Ajisafe alleges that the District unfairly obstructed his ability to extend his reasonable accommodation, connecting his opposition to his disabled status.   Moreover, "the act of requesting in good faith a reasonable accommodation is a protected activity," *Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir. 2014), and Mr. Ajisafe's email can be understood as part of his request to extend his accommodation, *see* ECF No. 1-1, at 138 (arguing that his "initially approved accommodation acknowledged that there is no undue hardship caused to DDOT and indicated that the accommodation was not provided on a trial basis" (emphasis omitted)).

Similarly, "[c]omplaining about a failure to receive an accommodation is protected activity for purposes of a retaliation claim."  *Congress v. District of Columbia*, 324 F. Supp. 3d 164, 175 (D.D.C. 2018) (finding that the plaintiff engaged in protected activity when she complained at a meeting about her supervisor's failure to provide her accommodations).   Mr. Ajisafe therefore sufficiently alleges that he engaged in protected activity when he "escalated [his] concerns about the termination" of his accommodation to DDOT leadership, ECF No. 1, at 46, and complained about "the agency's refusal to re-engage in the interactive process," ECF No. 10, at 18; *see* ECF No. 1-1, at 148.

### 3.    Materially adverse action

The District does not argue that requiring Mr. Ajisafe to complete "hourly activity logs" and placing him on a PIP, ECF No. 1, at 45-46, were not materially adverse actions, *see* ECF No. 8, at 13-15, so the court only needs to consider the District's materiality argument as it concerns the

20

failure to extend Mr. Ajisafe's accommodation (for his retaliation claim under the DCHRA) and the increase in his workload (for his retaliation claims under both the ADA and DCHRA), *id.* The court concludes that Mr. Ajisafe has plausibly alleged a materially adverse action based on his increased workload.

In the retaliation context, an employment action is "materially adverse" if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[7] *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Retaliation therefore "'encompass[es] a broader sweep of actions' than wrongful discrimination, including 'extend[ing] beyond workplace-related or employment-related retaliatory acts and harms.'" *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 150-51 (D.D.C. 2013) (quoting *Bridgeforth v. Jewell*, 721 F.3d 661, 663 n.* (D.C. Cir. 2013)). Whether an action "is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (internal quotation marks omitted).

The court agrees with the District that the denial of Mr. Ajisafe's request to extend his accommodation cannot itself be an adverse action supporting his retaliation claim under the DCHRA.[8] *See Sandler*, 2022 WL 4547557, at *9 (finding that the plaintiff could not "bootstrap herself into a retaliation claim by claiming that denial of her requests for accommodations was itself an act of retaliation"); *Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) (explaining that

---

[7] While *Muldrow* changed the adverse-action standard for discrimination claims, the Court clarified that the threshold did not change for retaliation claims and the "materially adverse" standard thus remains. 601 U.S. at 357-58.

[8] As explained above, *see supra* p. 18, Mr. Ajisafe did not timely exhaust this claim under the ADA.

if denying a reasonable accommodation request could itself support a claim of retaliation, "then every failure-to-accommodate claim would be doubled").  But, as in the discrimination context, Mr. Ajisafe's increased workload is a materially adverse action.  A significant increase in work assignments "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington*, 548 U.S. at 68); *see Chien v. Sullivan*, 313 F. Supp. 3d 1, 17 (D.D.C. 2018) (finding that a retaliation claim based on the "assignment of additional 'duty weeks'"—requiring the plaintiff to be on standby for assignment on her off days—survived a motion to dismiss).[9]

### 4.    Causal link

Finally, Mr. Ajisafe sufficiently alleges a causal link between the alleged protected activity and adverse actions.  The District argues only that Mr. Ajisafe fails to show a causal connection between his protected activity and the denial of his accommodation extension request, ECF No. 8, at 14 n.5, which the court has already rejected for failure to exhaust under the ADA and for lack of an adverse action under the DCHRA.  Because the District does not contest causation as to

---

[9] Mr. Ajisafe argues in his opposition that he suffered adverse actions when he was "subjected to a hostile meeting on October 31" and "issued a documentation ultimatum in December."  ECF No. 10, at 16.  While threats can constitute retaliatory action, *see, e.g.*, *Ali v. District of Columbia Gov't*, 697 F. Supp. 2d 88, 92 (D.D.C. 2010), the alleged statements here "question[ing] . . . the necessity of maintaining" Mr. Ajisafe's accommodation and threatening to revoke the accommodation, ECF No. 1, at 17-18, would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington*, 548 U.S. at 68); *see Touvian v. District of Columbia*, 330 F. Supp. 3d 246, 252 (D.D.C. 2018) (finding that statements implicitly threatening to terminate the plaintiff did not qualify as an adverse action).  Indeed, the D.C. Circuit has held that even "sporadic verbal altercations or disagreements," including "profanity-laden yelling," do not qualify as adverse actions.  *Baloch*, 550 F.3d at 1199.

Mr. Ajisafe's remaining retaliatory acts—his increased workload, invasive monitoring, and placement on a PIP—those claims may proceed.

### D.    Hostile Work Environment (Count 4)

To state a hostile work environment claim under the ADA or the DCHRA, a plaintiff must show that he "was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see Squires v. Gallaudet Univ.*, No. 20-CV-1348, 2021 WL 4399554, at *6 (D.D.C. Sep. 27, 2021) (applying the same standard for claims brought under the ADA and the DCHRA); *see also Hill*, 897 F.3d at 237 (assuming without deciding that a hostile work environment claim is cognizable under the ADA). "In evaluating a hostile work environment claim, the court 'looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.'" *Ayissi-Etoh*, 712 F.3d at 577 (quoting *Baloch*, 550 F.3d at 1201). "The 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Hill*, 897 F.3d at 237 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Mr. Ajisafe alleges that the District created a hostile work environment by misrepresenting his disabilities and accommodations, imposing an excessive workload and unrealistic deadlines, making "[s]landerous accusations undermining [his] credibility," and taking retaliatory actions against him. ECF No. 1, at 48. These allegations, whether considered individually or collectively, do not describe conduct that is sufficiently severe or pervasive to constitute a hostile work environment. First, Mr. Ajisafe's supervisors' accusations that he fabricated a panic attack and

23

their skepticism about the necessity of his accommodation, *see* ECF No. 1, at 17-18, 28, resemble the kind of "petty insults, vindictive behavior, and angry recriminations" that do not give rise to a hostile work environment claim, *Townsend v. United States*, 236 F. Supp. 3d 280, 314 (D.D.C. 2017) (quoting *Brooks v. Grundmann*, 748 F.3d 1273, 1277-78 (D.C. Cir. 2014)); *see Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing a Title VII hostile work environment claim where the plaintiff was placed on leave because of a false accusation, colleagues criticized his accent, he was told that he could easily be replaced with an American, and his supervisor told him that they would not hire other Africans).  *Cf. Vijiarungam v. Am. Acad. of Ophthalmology, Inc.*, No. 19-CV-2464, 2020 WL 13049430, at *2 (D.D.C. May 28, 2020) (denying a motion to dismiss a hostile work environment claim where the plaintiff alleged that her employer "rescinded her accommodation, attacked her [appearance] and 'accused her of gaining weight,' created 'false personnel records,' conditioned reinstatement of her requested accommodation upon signing an acknowledgement of 'poor performance,' and terminated her" (citations omitted)).

Similarly, Mr. Ajisafe's assertions that the District ignored his "pleas for reconsideration" of his accommodation and failed to respond with "empathy or dialogue" to his deteriorating mental health, ECF No. 10, at 21-22, describe indifference, not "severe and pervasive discriminatory intimidation or insult," *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003).  And his complaints about his burdensome workload, placement on a PIP, monitoring, and AWOL charge fall within the category of "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (internal quotation marks omitted); *see Taylor*, 2022 WL 990682, at *4 (dismissing a hostile work environment claim based on allegations that the plaintiff's employer monitored her arrival and departure times, used coworkers to assist with such monitoring, and allowed coworkers to taunt

her); *Walden v. Patient-Centered Outcomes Rsch. Inst.*, 177 F. Supp. 3d 336, 345 (D.D.C. 2016) (finding that placement on a PIP and a negative performance evaluation were not sufficiently severe to constitute a hostile work environment). The court acknowledges and is sympathetic to Mr. Ajisafe's allegations that he was driven to "psychiatric collapse" and attempted suicide because of his working conditions, ECF No. 10, at 22, but his allegations fall short of describing an environment "that a reasonable person would find hostile or abusive," *Harris*, 510 U.S. at 21-22.

Moreover, Mr. Ajisafe's hostile work environment claim is "essentially an amalgamation" of his discrimination, retaliation, and FMLA claims, "which '[c]ourts have been reluctant to transform . . . into a cause of action for hostile work environment.'" *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 53 (D.D.C. 2015) (alterations in original) (quoting *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011)); *see Jones v. D.C. Off. of Unified Comm'cns*, No. 25-CV-1129, 2025 WL 2977585, at *6 (D.D.C. Oct. 22, 2025) (noting that it is "disfavored" for a plaintiff to rely on "'the same discrete acts' upon which she bases her ADA discrimination and retaliation claims" (quoting *Townsend*, 236 F. Supp. 3d at 312)). Courts in this Circuit generally "frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *Walden*, 177 F. Supp. 3d at 344-45 (quoting *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013)). Accordingly, the court will dismiss Mr. Ajisafe's hostile work environment claim.

### E.   Constructive Discharge (Count 5)

"[A] constructive discharge occurs where the employer creates or 'tolerates discriminatory working conditions that would drive a reasonable person to resign.'" *Katradis v. Dav-El of Wash.*, 846 F.2d 1482, 1485 (D.C. Cir. 1988) (quoting *Hopkins v. Price Waterhouse*, 825 F.2d 458, 472

25

(D.C. Cir. 1987)).  To allege constructive discharge, the plaintiff must show "that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that [he] had no option but to end [his] employment."  *Walden*, 177 F. Supp. 3d at 346 (quoting *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 102 (D.D.C. 2011)).  "'The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?'  This showing requires 'something more' than, say, a hostile work environment claim alone."  *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)).  "The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination."  *Id.* (quoting *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006)).

The District argues that, because Mr. Ajisafe has failed to show that his work environment was hostile, his constructive discharge claim also fails.  ECF No. 8, at 17 n.7.  The court agrees.  Mr. Ajisafe's constructive discharge claim is based on the same factual allegations that support his hostile work environment claim, which this court has already rejected.  *Compare* ECF No. 10, at 21-22, *with id.* at 24-25.  "Given that the court has found that [Mr. Ajisafe] has failed to plead sufficient facts to make out a hostile work environment claim, logic compels the finding that [he] has not sufficiently pleaded a constructive discharge claim."  *Walden*, 177 F. Supp. 3d at 346-47; *see Huang v. Wheeler*, 215 F. Supp. 3d 100, 113 (D.D.C. 2016) (explaining that constructive discharge requires more support than "a hostile-work-environment claim so that the plaintiff's resignation qualifies as a fitting response to the discrimination").

In any event, Mr. Ajisafe's placement on a PIP and AWOL charge are not so extreme that they rise to the level of "aggravating factors" justifying his conclusion that he had no choice but to resign. ECF No. 10, at 24-25. And while the deliberate denial of an accommodation can support a constructive discharge claim, a plaintiff must allege that his employer "deliberately denie[d] an accommodation knowing that the denial will make working conditions so intolerable that the disabled employee will be forced to resign." *Floyd*, 968 F. Supp. 2d at 330. Here, Mr. Ajisafe has not sufficiently alleged both that the District knew that he would be forced to quit if his disability were not accommodated and that the District "intended that result." *Id.* To the contrary, the District reinstated Mr. Ajisafe's accommodation after his suicide attempt, albeit on a "temporary" basis. ECF No. 10, at 25. His allegations therefore "do not reflect the degree of extreme mistreatment required to plausibly show that the [District] 'deliberately made working conditions intolerable and drove [him] into an involuntary quit.'" *Valentine v. Towers Condo. Ass'n*, No. 22-CV-3216, 2024 WL 1299462, at *3 (D.D.C. Mar. 26, 2024) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981)).

### F.    FMLA (Count 6)

The FMLA "entitles eligible employees to take unpaid leave for family and medical reasons." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 160 (D.C. Cir. 2015). "An employer may be held liable for violating the FMLA under two distinct claims: (1) interference, if the employer restrained, denied, or interfered with the employee's FMLA rights, and (2) retaliation, if the employer took adverse action against the employee because the employee took leave or otherwise engaged in activity protected by the Act." *Holloway v. D.C. Gov't*, 9 F. Supp. 3d 1, 7 (D.D.C. 2013); *see* 29 U.S.C. § 2615(a). Mr. Ajisafe alleges that the District interfered with his FMLA rights by charging him with AWOL while his "FMLA certification was still pending and

before the medical documentation deadline had passed."  ECF No. 10, at 27; *see* ECF No. 1, at 50.  While Mr. Ajisafe does not explicitly raise an FMLA retaliation claim, his complaint also alleges that the AWOL charge "constituted retaliation for asserting [his] rights under the FMLA."  ECF No. 1, at 33; *see id.* at 50 (arguing that the District's "punitive action violated FMLA protections against retaliation and interference").  Accordingly, and because "there is a good deal of overlap" between interference and retaliation claims, *Gordon*, 778 F.3d at 161, the court will construe Mr. Ajisafe's complaint as raising both interference and retaliation claims under the FMLA.

### 1.    Interference

Mr. Ajisafe alleges that in mid-July 2023, his healthcare provider submitted an FMLA application to allow him to participate in mental health treatment and that on July 26, the District requested additional documentation by August 15.  ECF No. 1, at 32; *see* ECF No. 1-1, at 162-63, 171.  Even though his healthcare provider "promptly submitted the required documents," the District nevertheless "demanded [that Mr. Ajisafe] return to work on August 1, 2023, despite the ongoing FMLA process."  ECF No. 1, at 32.  When he did not return to work on August 2, the District charged him with AWOL for July 26, July 27, July 31, August 1, and August 2, allegedly interfering with his FMLA rights.  *Id.*; *see* ECF No. 1-1, at 164.

"To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference."  *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020).  The District challenges only the prejudice prong of Mr. Ajisafe's interference claim.  *See* ECF No. 8, at 19; ECF No. 11, at 13-14.  "Prejudice exists where an employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through

28

appropriate equitable relief." *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 144 (D.D.C. 2010). A finding of prejudice is crucial because "[r]emedies for FMLA interference claims are 'tailored to the harm suffered.'" *Waggel*, 957 F.3d at 1377 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Mr. Ajisafe's assertions that the AWOL charge "was issued at a time when [Mr. Ajisafe] was under medical instruction to avoid stressors," "compounded his recovery challenges," "cemented the District's institutional disregard for his protected rights," and "sent a chilling message" to other employees, do not support a finding of prejudice. ECF No. 10, at 28. Mr. Ajisafe does not allege that the AWOL charge caused him to lose compensation or benefits, nor does he allege that the District's interference caused him to use his leave "in a way that directly caused [him] monetary losses." *Kelly v. Richard Wright Pub. Charter Sch.*, No. 16-CV-1853, 2019 WL 451348, at *4 (D.D.C. Feb. 4, 2019); *Ragsdale*, 535 U.S. at 89 (explaining that the prejudice element ensures that an "employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion" (quoting 29 U.S.C. § 2617(a))). *Cf. McCann v. District of Columbia*, No. 23-CV-2398, 2025 WL 958130, at *9 (D.D.C. Mar. 31, 2025) (finding that the plaintiff sufficiently alleged prejudice based on "unnecessary costs" resulting from the alleged interference); *Gordon*, 778 F.3d at 166 (finding that allegations of monetary losses and "diminish[ed] . . . prospects for pay increases, promotion, and transfer" sufficiently demonstrated prejudice to survive a motion to dismiss). The court will accordingly dismiss Mr. Ajisafe's interference claim as it concerns these harms.

But Mr. Ajisafe also alleges harm based on the AWOL charge remaining in his employment record. ECF No. 10, at 28; *see* ECF No. 1, at 50 (seeking expungement of the AWOL

charge). The existence of an allegedly erroneous AWOL charge in Mr. Ajisafe's personnel file is sufficient at the pleading stage to allege "some loss in employment status remediable through appropriate equitable relief." *Cobbs*, 746 F. Supp. 2d at 144; *see Roseboro v. Billington*, 606 F. Supp. 2d 104, 113 (D.D.C. 2009) (finding at summary judgment that the presence of "erroneous AWOL charges" in the plaintiff's personnel record constituted prejudice supporting an FMLA interference claim and ordering expungement of the charges). The court will therefore allow this aspect of Mr. Ajisafe's FMLA interference claim to proceed.

### 2.    Retaliation

Mr. Ajisafe alleges that the District charged him with AWOL in retaliation for requesting FMLA leave. ECF No. 1, at 33. To state a retaliation claim under the FMLA, a plaintiff must allege facts showing "(1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action." *Waggel*, 957 F.3d at 1375. Mr. Ajisafe has met his burden at the motion-to-dismiss stage.

First, requesting FMLA leave is a protected activity. *See Gordon*, 778 F.3d at 162. Next, Mr. Ajisafe plausibly alleges that he suffered an adverse employment decision when the District charged him as AWOL for five days. *See Mitchell v. Garland*, No. 20-CV-3083, 2022 WL 703906, at *5 (D.D.C. Mar. 9, 2022) (denying a motion to dismiss a Title VII retaliation claim because an AWOL designation constituted a materially adverse action). Finally, as to causation, the close proximity between Mr. Ajisafe's request for FMLA leave in mid-July 2023 and the AWOL charge in early August 2023 plausibly suggests a causal connection. ECF No. 1, at 32. "'Temporal proximity is often found sufficient to establish the requisite causal connection' for FMLA retaliation claims." *Pressley*, 2023 WL 5206107, at *15 (quoting *Gleklen v. Dem. Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000)) (concluding that a gap of two

months between the plaintiff's request for FMLA leave and his termination was sufficient to permit an inference of a causal connection); *see Holodnak v. Serv. Emps. Int'l Union*, No. 20-CV-3250, 2021 WL 5578675, at *5 (D.D.C. Nov. 30, 2021) ("Given that there is at least some support in the case law for a four-month gap, dismissing the FMLA retaliation claim is not justified at this time.").

To be sure, the District may argue at a later stage of the litigation that the AWOL charge was not erroneous or retaliatory. Indeed, Mr. Ajisafe does not specify the duration of his requested leave, and the partial application attached to his complaint suggests that he did not request FMLA leave for the days he was charged AWOL. *Compare* ECF No. 1-1, at 163 (seeking leave for the period between June 29, 2023 and July 20, 2023), *with id.* at 164 (charging Mr. Ajisafe with AWOL for July 26, July 27, July 31, August 1, and August 2). But, drawing all inferences in his favor, as the court must in considering the District's motion to dismiss, the court concludes that Mr. Ajisafe has sufficiently alleged a retaliation claim under the FMLA.

*    *    *

In summary, the court will grant the District's motion to the extent that DDOT is dismissed from the case, Count 2 is dismissed as it concerns the revocation of Mr. Ajisafe's accommodation and hostile interactions, Counts 3A and 3B are dismissed as they concern the revocation of Mr. Ajisafe's accommodation, Counts 4 and 5 are dismissed in their entirety, and Count 6 is dismissed as it concerns interference unrelated to the AWOL charge in his employment record. Mr. Ajisafe may proceed on Count 1 in its entirety, Count 2 as it concerns his increased workload, Counts 3A and 3B as they concern increased workload, monitoring, and placement on a PIP, and Count 6 as it concerns his interference claim about the AWOL charge in his employment record and his retaliation claim.

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss, ECF No. 8, is **GRANTED** in part and **DENIED** in part.  The District of Columbia shall respond to the remaining counts in the complaint on or before March 27, 2026.  It is further **ORDERED** that Plaintiff's Motion for Order, ECF No. 12, and Motion for Status Conference, ECF No. 13, are **DENIED** as moot.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 13, 2026

32